**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**33 SEMINARY LLC; 31 SEMINARY LLC; and**
**26 SEMINARY AVENUE PROJECT LLC,**

                         **Plaintiffs,**

        **vs.**                                    **3:11-CV- 1300**
                                                   **(MAD/DEP)**

**THE CITY OF BINGHAMTON; MATTHEW T.**
**RYAN, Individually and as Mayor of Binghamton;**
**KENNETH J. FRANK, Individually and as Corporation**
**Counsel for the City of Binghamton; THOMAS COSTELLO,**
**Individually and as Supervisor of Building and Construction**
**and Code Enforcement for the City of Binghamton; DAVID**
**CHADWICK, Individually and as Former Supervisor of**
**Building and Construction for the City of Binghamton; KEVIN**
**ESWORTHY, Individually and as former Building Inspector**
**of the City of Binghamton; JOHN STELLA, Individually and as**
**Chairman of the Planning Commission of the City of Binghamton;**
**MARK YOUNG, Individually and as Member of the Planning**
**Commission of the City of Binghamton; MICHELLE O'LOUGHLIN,**
**Individually and as Member of the Planning Commission of the City**
**of Binghamton; ROBERT POMPI, Individually and as Member**
**of the Planning Commission of the City of Binghamton; THOMAS**
**POLLACK, Individually and as Member of the Planning Commission**
**of the City of Binghamton; EARL WALKER, Individually and as**
**Member of the Planning Commission of the City of Binghamton;**
**JAMES WORHACH, Individually and as Member of the Planning**
**Commission of the City of Binghamton; KELLY LIGEIKIS, Individually**
**and as Member of the Planning Commission of the City of Binghamton;**
**JOANN MASTRONARDI, Individually and as Chairman of the**
**Zoning Board of Appeals for the City of Binghamton; VLADIMYR**
**GOUIN, Individually and as Member of the Zoning Board of Appeals**
**for the City of Binghamton; DONALD HANRAHAN, Individually**
**and as Member of the Zoning Board of Appeals for the City of**
**Binghamton; CARMAN GARUFI, Individually and as Member**
**of the Zoning Board of Appeals for the City of Binghamton; and**
**GERALD O'BRIEN, Individually and as Member of the Zoning**
**Board of Appeals for the City of Binghamton,**

                         **Defendants.**

_____

**APPEARANCES:**                           **OF COUNSEL:**

**OFFICE OF ALISON MURADIAN DREW**         **ALISON M. DREW, ESQ.**
386 Quaker Road
Chappaqua, New York 10514
Attorneys for Plaintiffs

**CITY OF BINGHAMTON CORPORATION**         **BRIAN M. SEACHRIST, ESQ.**
**COUNSEL**
38 Hawley Street
City Hall
Binghamton, New York 13901
Attorneys for Defendants

**HANCOCK ESTABROOK, LLP**                 **DANIEL B. BERMAN, ESQ.**
1500 AXA Tower I                           **HOLLY KOZLOWSKI AUSTIN, ESQ.**
100 Madison Street                         **ROBERT J. THORPE, ESQ.**
Syracuse, New York 13221                   **WENDY ANN MARSH, ESQ.**
Attorneys for Defendants                   **ZACHARY M. MATTISON, ESQ.**

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On November 2, 2011, Plaintiffs commenced this action pursuant to 42 U.S.C. § 1983.

*See* Dkt. No. 1.  Plaintiffs allege that Defendants violated Plaintiffs' rights under the Due Process

and Equal Protection Clauses by denying Plaintiffs certain building permits and variances

Plaintiffs sought for desired construction on two properties located within the City of

Binghamton.  *See* Dkt. No. 40.  Plaintiffs also allege that certain provisions of Binghamton City

Ordinance 009-009 are unconstitutionally vague.  *See id.* at ¶¶ 224, 235-42.  Presently before the

Court are the parties' cross-motions for summary judgment.  *See* Dkt. No. 99; Dkt. No. 118.

## II. BACKGROUND

**A.      Factual Background**

*1. The Ordinance*

On March 16, 2009, the Binghamton City Council adopted Ordinance 009-009, An Ordinance to Expand the Planning Commission's Review of Commercial and Residential Development ("the Ordinance"), which amended certain sections of Chapter 410 of the Zoning Ordinance of the City of Binghamton. *See* Dkt. No. 99-2 at 68-72. Defendant Ryan approved the Ordinance on March 22, 2009. *Id.* at 68. The City Council's stated purpose for the Ordinance was "to amend certain sections of Chapter 410 to expand the types of projects which require Planning Commission review and approval." *Id.*

As amended, Section 410-27 of the Ordinance provides in relevant part that

[t]he following uses are permitted in residential zoning districts:

. . . .

        B. R-2 Residential One- and Two-Unit Dwelling District.
        (1) Permitted by right.
            (a) Principal uses:

. . . .

            Single-unit residences

. . . .

            Two-unit residences

. . . .

        (3) Permitted with Planning Commission approval
        (special use permit and Series A site plan).
            (1) Principal uses:

. . . .

            Conversion of dwelling Unit to More than
            Four Bedrooms

. . . .

C. R-3 Residential Multi-Unit Dwelling District.
    (1) Permitted by right.
        (a) Principal uses:

        . . . .

        Single-unit residences

        . . . .

        Two-unit residences

        . . . .

    (2) Permitted with Planning Development approval
(Series B site plan).
        (a) Principal uses:

        . . . .

        Multi-unit dwelling: new construction or
conversion of existing building into three or
four units

        . . . .

    (3) Permitted with Planning Commission approval
(special use permit and Series A site plan).
        (a) Principal uses:

        . . . .

        Conversion of Dwelling Unit to More than
Four Bedrooms

City of Binghamton, N.Y., Zoning Ordinance § 410-27 (Aug. 7, 2006, amended 2009) ("Zoning

Ordinance").

        Section 410-29(G) of the Ordinance, pertaining to the conversion or construction of

dwelling units to more than four bedrooms, provides in relevant part that "[n]o dwelling unit

4

conversion shall be permitted unless the dwelling shall, following such conversion, comply with all off-street parking required by Article X of the Zoning Ordinance." Zoning Ordinance § 410-29(G)(2)(d). Section 410-53 of Article X provides in relevant part that "[t]he minimum number of off-street parking spaces required for land uses or activities permitted by this chapter shall be as set forth in Schedule III, which is hereby adopted and made part of this article." *Id.* § 410-53. Schedule III in turn provides that the minimum space(s) required are two spaces per unit for a single- or two-unit dwelling, 1.50 spaces per unit for a multi-unit dwelling, and 2.33 spaces per unit for a multi-unit dwelling with four or more bedrooms. *Id.* § 410-53(G).

Section 410-36 provides:

> A. Series A Site Plan approval from the Planning Commission pursuant to § 410.39 of this Article VIII is required for all new construction, for all commercial uses, for all special permitted uses, for all principal permitted and accessory uses, for all changes of use, and as required by § 410.27 or § 410.29 of this Chapter. No building permit shall be issued by the Building Inspector for any use which requires site plan approval except upon authorization of an[d] in conformity with plans approved by the Planning Commission.
>
> B. Exceptions. Notwithstanding Subsection A of this section, no Series A Site Plan approval is required for: (i) single- and two-family dwellings and accessory uses thereto, except as may be required by § 410.27 or § 410.29 of this Chapter; or (ii) any change of use from one principal permitted or accessory use to another principal permitted or accessory use, including changes of use within a permitted multiple use, e.g. a shopping center, and where no exterior alterations or additions are proposed, provided the Planning Department and Building Inspector determine that the proposed change of use will not have any significant impact on:
>     1. Traffic volume
>     2. Site access
>     3. On-site and off-site parking
>     4. Internal circulation
>     5. Neighborhood noise levels
>     6. Green space (The proposed project will not have created a need for additional landscaping, screening, or buffering)

<div style="margin-left: 2em;">
7.     Drainage

8.     Character of the neighborhood

9.     Lighting

The list of items to be considered above is inclusive, but not exclusive, and the Planning Department and Building Inspector may consider any environmental or development issues that would have a significant impact on the parcel and/or the surrounding area.

C. A special use permit and/or Series A site plan review which has been authorized for a specific land use is not transferable and does not apply to any other land use.
</div>

*Id.* § 410-36.

### 2. 26 Seminary Avenue

On July 11, 2007, Plaintiff 26 Seminary Avenue Project LLC ("26 Seminary") purchased a three-story building located at 26 Seminary Avenue in the City of Binghamton ("the 26 Seminary Property"). Dkt. No. 40 at ¶ 140. At the time of purchase, the building contained a commercial space on the ground floor, two apartments on the second floor, and one apartment on the third floor. *Id.* at ¶ 141.

On December 28, 2007, 26 Seminary applied for a building permit to "install[] sub flooring providing for radiant heat" at the 26 Seminary Property. Dkt. No. 118-5 at 47. On December 30, 2007, 26 Seminary submitted to Defendant Chadwick a floor plan for the 26 Seminary Property which demonstrated four bedrooms and a kitchen and a roof design. *Id.* at 50-53. A cover letter addressed to Defendant Chadwick indicated that the enclosed floor plan was "typical for all three floors." *Id.* at 50. On January 4, 2008, 26 Seminary was issued Building Permit 8A, which authorized the installation of sub flooring. *See id.* at 79-82.[1] On February 30,

---

[1] On the same date, the "Current Use of Property" section of the building permit application was modified from "R-3" to "mixed use." *See* Dkt. No. 118-5 at 81. Defendants represent that Defendant Chadwick made this change "to reflect that the building had a Mixed Use and was not just residential." Dkt. No. 120-1 at ¶ 3.

2009, Building Permit 8A was cancelled after the building inspector observed that the floor had been installed without the required inspection. *Id.* at 83.

On January 31, 2008, 26 Seminary applied for a second building permit, seeking to "frame walls [–] partial sheet rock." *Id.* at 85. On May 2, 2008, 26 Seminary was issued Building Permit 132A, which authorized wall framing and partial sheet rock. *See id.* at 85, 89. The Required Construction Inspection Listing enclosed with the permit indicated that proposed construction included "remove existing third floor and replace, interior renovations." *Id.* at 88. A letter from Defendant Chadwick accompanying the building permit noted that the permit was "for the interior renovations only and does not include the removal and addition of the third floor" and that an additional building permit application was required for the proposed third floor renovation. *Id.* at 87.

On June 30, 2008, Defendant Chadwick issued an electrical permit that authorized the wiring of apartments and an addition at the 26 Seminary Property. *See id.* at 91. The electrical permit application noted no change of use of the building. *Id.*

On July 2, 2008, 26 Seminary submitted a third building permit application, which sought permission to perform a roof replacement. *Id.* at 93. The application noted "3-F" as the property's current use. *Id.* The application was approved and Building Permit 238A granted on July 3, 2008. *See* Dkt. No. 118-6 at 2. The Required Construction Inspection Listing enclosed with the permit listed the proposed construction as "[r]emove existing third floor and replace." *Id.* at 3. Defendant Chadwick's accompanying letter again noted that the permit was for interior renovations only and did not include the removal and addition of the third floor. *Id.* at 2. It also notified 26 Seminary that "[b]uilding permits shall become invalid unless the authorized work is commenced within six months following the date of issuance" and "shall expire 12 months after

the date of issuance." *Id.* On seven different inspection dates between July 8, 2008 and January 7, 2009, no work had been started on the 26 Seminary Property roof. *See* Dkt. No. 120-4 at 2. Consequently, Defendants cancelled Building Permit 238A on January 8, 2009. *See* Dkt. No. 118-20 at 29-30.[2]

On April 17, 2009, 26 Seminary submitted an application to the Planning Commission seeking site plan review and a special use permit. *See* Dkt. No. 99-2 at 2-8. 26 Seminary described the proposed project as follows: "[i]ncrease [number] of bedrooms from 4 per floor to 5," "change 1st floor from non-conforming use to conforming use," and "waive[] required min[imum] from 1500 [square feet] to 1440 [square feet]." *Id.* at 3. On December 7, 2009, 26 Seminary submitted a second application to the Planning Commission proposing to convert the first floor of the 26 Seminary Property from commercial space to an apartment. *See id.* at 10-17. On the same date, 26 Seminary also applied to the Zoning Board of Appeals ("ZBA") for an area variance from the Ordinance's minimum off-street parking requirement for multi-unit dwellings of 1.50 off-street parking spaces per dwelling unit. *See id.* at 28; Dkt. No. 99-14 at ¶ 21.

In a December 17, 2009 staff report regarding 26 Seminary's area variance application, City Planner Patrick C. Day instructed the ZBA that it must "weigh the benefit to the applicant if the variance is granted against the detriment to the health, safety, and welfare of the neighborhood or community by such a grant." Dkt. No. 99-2 at 28. City Planner Day also informed the ZBA that it must consider the following factors: (1) "[w]hether an undesirable change will be produced in the character of the neighborhood, or whether a detriment to nearby properties will be created;" (2) "[w]hether the Applicant can achieve his goals via a reasonable

---

[2] Defendant Esworthy's deposition testimony refers to a written cancellation of Building Permit 238A dated January 8, 2009. *See* Dkt. No. 118-20 at 24-25, 29-30. Neither party submitted the cancellation letter with their respective motions for summary judgment.

alternative that does not involve the necessity of an area variance;" (3) "[w]hether the variance requested is substantial;" (4) "[w]hether the requested variance will have an adverse impact on the physical or environmental conditions in the neighborhood or district;" and (5) "[w]hether the alleged difficulty was self-created, which consideration shall be relevant to the decision of the Zoning Board of Appeals, but shall not necessarily preclude the granting of the area variance." *Id.*

On January 5, 2010, 26 Seminary member Isaac Levin appeared at a public hearing before the ZBA on behalf of 26 Seminary in support of its application for an area variance for parking. *See* Dkt. No. 118-7 at 58-82.[3] Marlene Lausen, a resident of the neighborhood in which the 26 Seminary Property is located, and Teri Rennia, a city council representative for the district within which the 26 Seminary Property is located, both spoke in opposition to 26 Seminary's application. *Id.* at 63-69. Ms. Lausen and Ms. Rennia both noted the scarcity of off-street parking in the neighborhood encompassing the 26 Seminary Property. *See id.* at 64-65, 67-69. After

---

[3] Plaintiffs contend that on June 25, 2009, they presented the ZBA with a plan to provide six parking spaces for the 26 Seminary Property on the property. Dkt. No. 118-3 at 10-36, Plaintiffs' Counterstatement of Material Facts in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment ("Plaintiffs' Counterstatement"), at ¶ 10. A May 27, 2009 Staff Report by City Planner Day indicates that Mr. Levin applied for an area variance to create an off-street parking lot on the rear of the property at 31 Seminary Avenue that would "provide off-street parking for tenants of the subject property, as well as tenants of other properties in the area which are also owned by the applicant." Dkt. No. 99-2 at 85; *see also* Dkt. No. 118-6 at 70 (discussing Mr. Levin's application to the ZBA for a variance that would "allow the creation and dedication of four (4) parking spaces to meet the parking requirements for [the 31 Seminary Avenue project], [as] well as seven (7) more spaces for use by residents of another of the applicant's properties, at 26 Seminary Avenue."). However, the ZBA denied Mr. Levin's variance application in an official decision on June 5, 2009. *See* Dkt. No. 99-2 at 82-83. Thus, at the time that the ZBA issued its decision as to 26 Seminary's requested area variance, 26 Seminary could not provide off-street parking for its tenants at 31 Seminary Avenue. As Defendants correctly stated, during the January 5, 2010 public hearing before the ZBA, "Mr. Levin made no mention of any 'plan to provide six parking spaces for 26 Seminary Avenue on the property,' and appears to admit that 26 Seminary was unable to do so." Dkt. No. 120-1 at ¶ 10; *see also* Dkt. No. 118-7 at 70-71 (public hearing testimony of Mr. Levin indicating that 26 Seminary had "tried to provide parking," but that "[r]ight now it's not possible").

deliberation, Defendants Garufi, Gounin, and O'Brien voted to deny the area variance application. *Id.* at 80-81. When making the motion to deny the application, Defendant Garufi noted that the area variance would "create an undesirable change in the neighborhood," that 26 Seminary had reasonable alternatives, that 26 Seminary's request was substantial, and that the hardship was self-created. *Id.* at 81; *see also* Dkt. No. 99-2 at 35-37 (Official Decision noting the same reasons for the ZBA's denial of 26 Seminary's area variance application). To date, the 26 Seminary Property remains vacant. *See* Plaintiffs' Counterstatement at ¶ 10; Dkt. No. 120-1 at ¶ 10.

### 3. 31 Seminary Avenue

On January 30, 2009, Plaintiff 33 Seminary LLC ("33 Seminary") purchased a single-family home located at 31 Seminary Avenue ("the 31 Seminary Property"). *See* Dkt. No. 40 at ¶¶ 56, 60. On April 8, 2009, 33 Seminary submitted an application to the ZBA for an area variance for the 31 Seminary Property. *See* Dkt. No. 99-2 at 74-80. Specifically, 33 Seminary sought an area variance reducing set-backs in two locations from five feet to four feet in order to create a parking lot for ten cars on the 31 Seminary Property. *Id.* at 75-76.

On April 14, 2009, 33 Seminary applied for an electrical permit to rewire and upgrade service at the 31 Seminary Property. Dkt. No. 118-6 at 52. The applicant noted no change of use and that the use of the building was a two-family home. *Id.* The application was approved and an electrical permit granted on April 29, 2009. *Id.*

On April 17, 2009, 33 Seminary submitted an application to the Planning Commission seeking site plan review and a special use permit. *See* Dkt. No. 99-2 at 96-101. 33 Seminary described the proposed project as "increase [the number] of bedrooms from 4 per floor to 5 per floor. Total 2 floors." *Id.* at 97, 101.

On April 28, 2009, the City of Binghamton issued 33 Seminary a building permit to

"remove[] interior walls[,] install radiant tubing, [and] clean up inside and outside." Dkt. No. 118-6 at 50.[4]

On April 30, 2009, 33 Seminary applied for a building permit to "erect new wall[, r]eplace roof[, p]artition floors as per floor plan." *Id.* at 54. Plaintiffs and Defendants agree that the application for the building permit demonstrated four bedrooms per unit. *See* Dkt. No. 99-14 at ¶ 6 ("On April 30, 2009 . . . Plaintiffs applied for a building permit stating that there would be four bedrooms per unit."); Plaintiffs' Counterstatement at ¶ 17 ("On April 30, 2009, a second building permit application was submitted . . . . The floor plan was for a 2 dwelling with 4 bedrooms each." (footnote omitted)). By letter to Defendant Chadwick dated May 6, 2009, 33 Seminary expressed its intent to revise the building permit application to reflect a single-family home. Dkt. No. 118-6 at 56. The letter also expressed 33 Seminary's belief that Defendants had denied its April 30, 2009 building permit application in a meeting between Mr. Levin, Corporation Counsel, and the City Planning Department held on May 5, 2009. *Id.*

On May 7, 2009, Mr. Levin sent a second letter to Defendant Chadwick on behalf of 33 Seminary, in which Mr. Levin argued that the conversion of a single-family house to a two-family house in an R-2 zone should be classified as a change in occupancy rather than a change in use.

---

[4] Plaintiffs allege that Defendants did not produce 33 Seminary Avenue's related building permit application in discovery. Plaintiffs' Counterstatement at ¶ 11. Defendants appear to misunderstand Plaintiffs' argument as pertaining to 33 Seminary's April 17, 2009 application to the Planning Commission, which Defendants produced. *See* Dkt. No. 120-1 at ¶ 11. Plaintiffs further contend that alongside the building permit application, 33 Seminary submitted a floor plan demonstrating four bedrooms per floor. Plaintiffs' Counterstatement at ¶ 11. In support of this contention, Plaintiffs direct the Court to Plaintiffs' Exhibit Z, which is a two-page floor plan labeled "31 Seminary" and "4 Bedrooms" and which demonstrates two floors with four bedrooms each. *See* Dkt. No. 118-6 at 32-34. The floor plan is stamped "Received" by the Building and Construction department on April 22, 2009. *Id.* at 32. Defendants dispute that this floor plan was submitted with 33 Seminary's building permit application. Dkt. No. 120-1 at ¶¶ 11, 15. The Court cannot determine from the record before it whether the floor plan was in fact submitted in connection with Plaintiff's April 17, 2009 building permit application.

*Id.* at 58-59. Mr. Levin therefore argued that his proposed conversion of the 31 Seminary Property did not trigger § 410-36 of the Ordinance because it did not constitute a change in use and thus did not require Series A Site Plan approval from the Planning Commission. *Id.* In support of this argument, Mr. Levin referenced the land use ordinances of the City of Portland, Oregon and the City of St. Paul, Minnesota. *Id.* at 58.

In a letter dated May 8, 2009, Defendant Chadwick notified 33 Seminary that its building permit application had not been denied and could not be processed until 33 Seminary obtained Series A Site Plan approval from the Planning Commission pursuant to § 410-36 of the Ordinance and the area variance it requested from the ZBA. *Id.* at 67. Defendant Chadwick noted that Series A Site Plan approval was required because 33 Seminary was proposing to convert a single-family home into a two-family home. *Id.* Defendant Chadwick also noted that Mr. Levin's alternative verbal proposal to convert the 31 Seminary Property into a single-family home with five bedrooms would still require Series A Site Plan approval under § 410-36. *Id.* at 68. In addition, Defendant Chadwick advised 33 Seminary that its only valid building permit authorized solely the deconstruction of the interior of the property. *Id.*

By letter dated May 11, 2009, Mr. Levin informed Defendant Chadwick of an alleged telephone conversation he had with Brian Seachrist on May 8, 2009. *Id.* at 65. Mr. Levin indicated that he "could not understand the entire content of the conversation," but that he "heard [Mr. Seachrist] saying that as long as it is 4 bedrooms . . . . . . . . not sure what else he said. I hope that he said that the application for a 2 family with 4 bedrooms would be approved at this time." *Id.* Mr. Levin also clarified that "the current application is for a permit for a conversion from a one family house to a two family house each having 4 bedrooms with further applications to the planning board to increase to 5 bedrooms." *Id.*

On May 14, 2009, 33 Seminary submitted a new building permit application for a single-family dwelling with four bedrooms and two auxiliary rooms. *See* Dkt. No. 99-14 at ¶ 8; Plaintiffs' Counterstatement at ¶ 22. On May 21, 2009, 33 Seminary faxed Defendant Chadwick a letter inquiring on the status of its May 14, 2009 permit application for construction on a single-family home. Dkt. No. 118-6 at 77. 33 Seminary also expressed its willingness to withdraw its pending applications with the Planning Commission for Series A Site Plan approval and with the ZBA for an area variance. *Id.* On May 26, 2009, 33 Seminary faxed City Planner Day its withdrawal of all existing applications in front of the Planning Commission and ZBA. *Id.* at 80. 33 Seminary also informed Defendant Chadwick of its withdrawal via fax and "renew[ed] the application for the building permit for a single family house with the current site plan." *Id.* at 79. On the same date, Defendant Chadwick informed 33 Seminary via letter that its May 14, 2009 building permit application was denied. *Id.* at 82. Defendant Chadwick explained that "[t]he floor plan as submitted is nearly identical to the floor plan that was submitted as part of your application to the Planning Commission for a Series A Site Plan Approval. Simply renaming the rooms does not alleviate the need for the Series A Site Plan approval." *Id.* Defendant Chadwick instructed 33 Seminary to proceed with its Series A Site Plan application. *Id.*

On May 27, 2009, 33 Seminary informed City Planner Day via fax and e-mail that "the current application of 33 Seminary LLC in front of the [ZBA] could remain active but only if it is not being used as an excuse to continue to withhold a building permit." *Id.* at 84. 33 Seminary also informed Defendant Chadwick via fax that it was "renewing the application for a building permit for a single family as per drawing already provided to you." *Id.* at 85.

By letter dated June 3, 2009, Defendant Chadwick informed 33 Seminary that its application for a building permit "to renovate and to erect additions at the above captioned address

is still denied." *Id.* at 87.  Defendant Chadwick explained the basis of the denial as follows:

> The floor plan still shows the floor plan similar to a two family residence.
>
> The first floor consist[s] of a livingroom/kitchen, bedroom 1, bedroom 2 and two bathrooms and a fire rated enclosed stairway.
>
> The second floor exists of a play area, bedroom 1, bedroom 2 and two bathrooms and a fire rated enclosed stairway.
>
> Building plans for a single family residence do[] not have a fire rated stairways separating the first floor from the second floor, also the number of the bedrooms would be numbered 1 through 4.
>
> Please amend your plans to show that a single family residence is being proposed and built.

*Id.*

On the same date, 33 Seminary received a building permit to "erect new wall[, r]eplace roof[, and p]artition floors as per floor plan for a single family." *Id.* at 89.  Specifically, the authorized proposed construction included "side and rear addition and interior renovation for a four bedroom single family."  Dkt. No. 99-3 at 31.

On June 5, 2009, the ZBA denied 33 Seminary's application for area variances for minimum side setbacks, minimum total side setbacks, minimum rear setback, and maximum lot coverage.  *See* Dkt. No. 99-2 at 82-83.  The ZBA's denial was based on the following determinations: (1) the requested variances would adversely affect the neighborhood; (2) the reasonable alternative of paving less of the backyard and creating fewer parking spaces was available; (3) the requested variances were substantial; (4) the requested variances would adversely impact the physical condition of the neighborhood and could create storm water drainage issues negatively impacting the environmental condition of the neighborhood; and (5)

the alleged difficulty was self-created because 33 Seminary purchased the property without off-street parking or any representation that future parking variances were assured. *Id.*

On June 11, 2009, 33 Seminary submitted a new building permit application to convert the 31 Seminary Property into a two-family house with five bedrooms per floor. Dkt. No. 118-6 at 92. On June 17, 2009, 33 Seminary submitted an application for a building permit to convert the 31 Seminary Property into a two-family home with four bedrooms per floor. *Id.* at 95. On June 29, 2009, Defendant Chadwick informed 33 Seminary via letter that its June 17, 2009 building permit application was denied because the proposed conversion of the building from a single family use to a two family use was a change in use that required Series A Site Plan approval pursuant to § 410-36(A). *Id.* at 97.

On July 6, 2009, Defendant Esworthy issued 33 Seminary a stop work order for all work being performed on the 31 Seminary Property. *Id.* at 99. The order was issued "based on the statements of the contractor/workers on site that they are constructing a two family house with two kitchens and that the onsite plans were also for a two family house, as opposed to a one family dwelling for which a permit was issued." Dkt. No. 99-3 at 33. Defendants modified the stop work order on July 7, 2009 to permit 33 Seminary to complete work on the roof. *Id.*

On July 10, 2009, Defendant Chadwick informed 33 Seminary via letter that its June 11, 2009 building permit application was denied because the conversion of a single-family home into a two-family home with five bedrooms in each apartment required Series A Site Plan approval under §§ 410-6B, 410-29(G)-1(1)-(2), and 410-36(A). Dkt. No. 118-6 at 93.

On November 4, 2009, 33 Seminary submitted an application to the Planning Commission seeking Series A Site Plan review for a proposed conversion of the 31 Seminary Property into a two-unit home with five bedrooms per unit. *Id.* at 105-14. On December 1, 2009, Mr. Levin

appeared at a public meeting of the ZBA to request an interpretation as to whether a conversion of a single-family home to a two-family home was a "change of use" or "change of occupancy" under the Ordinance. *See id.* at 123-33. Mr. Levin's argument before the ZBA again centered around other municipalities' interpretations of "change of use" and "change of occupancy." *See id.* at 125-26. The ZBA noted that the Ordinance distinguishes between single-family residences and two-unit residences as separate uses and determined by unanimous vote that Mr. Levin's proposed conversion was a "change of use." *Id.* at 129-32.

In a December 9, 2009 Staff Report regarding 33 Seminary's proposed conversion to a two-family dwelling with five bedrooms per unit, City Planner Day noted that

> [t]he submitted site plan does not accurately indicate the dimensions of the front entrance extending from the structure towards Seminary Avenue. The minimum front setback in the R-2 District is 25 feet. The entrance appears to be significantly below the minimum requirement. The framed entrance, as it currently exists on the property, would require an area variance for minimum front setback in the R-2 District. The applicant has been notified of this requirement but has not submitted an application for such a variance.

Dkt. No. 118-7 at 2. The Staff Report further noted that

> [t]he applicant's submitted floor plan indicates only one means of ingress/egress for the proposed 2nd floor unit, which appears to require tenants to pass through the kitchen. Building Department has stated that this layout does not comply with New York State building code 1013.2 *Egress through intervening spaces*. The Planning Commission may wish to request floor plans which provide detail of all points of egress, and which comply with New York State building code.

*Id.* at 3.

On December 14, 2009, the Planning Commission conducted a public hearing regarding 33 Seminary's November 4, 2009 application. *See id.* at 9-40. The Planning Commission tabled a

vote on 33 Seminary's proposal until January 4, 2010 in order to give 33 Seminary an opportunity to address the egress and front setback issues identified in City Planner Day's December 9, 2009 Staff Report. *See id.* at 32-40. On January 4, 2010, the Planning Commission again tabled 33 Seminary's proposal to await correspondence from the Department of State regarding whether the building as proposed would classify as a family residence subject to the residential code or dormitory subject to the building code for purposes of egress requirements. *See id.* at 47-51.

On February 1, 2010, Mr. Levin appeared before the Planning Commission with a revised site plan that accurately depicted the dimensions of the property's entrance. *See id.* at 90-91. During the hearing, Defendant Costello confirmed that the property was classified as a family residence rather than dormitory and was in compliance with the egress requirements of the residential code. *See id.* at 97-98, 101, 112. The Planning Commission unanimously voted to deny 33 Seminary's revised proposal on the grounds that "the general requirements as set forth in Section 410-40 [of the Ordinance] for a special permit have not been met." *Id.* at 107-08. A Planning Commission Official Decision dated February 5, 2010 elaborated that the Planning Commission's concerns related to the proposal included "compatibility with the existing community and whether the increase in density of people and vehicles would create a negative impact on the surrounding neighborhood." *Id.* at 113.

On May 16, 2010, 33 Seminary submitted another application to convert the 31 Seminary Property into a two-family dwelling with five bedrooms per unit. *See id.* at 115-24. The revised site plan included a vestibule that complied with the setback requirements. *See id.* at 121. At a public hearing on the application on June 7, 2010, the Planning Commission took a straw poll that indicated that it would approve 33 Seminary's proposal if 33 Seminary agreed that each unit would have three bedrooms rather than five. *See* Dkt. No. 118-8 at 57. Mr. Levin rejected this

proposal on behalf of 33 Seminary, and the application was tabled. *Id.* at 57-58. After a second

public hearing on July 19, 2010, the Planning Commission denied 33 Seminary's application at the

close of a public hearing on August 2, 2010. *See id.* at 64, 101. The Planning Commission

members offered various reasons for the denial including the intensity of land usage, the

incompatibility of the structure with the general character of the neighborhood, the applicant's

attempts to circumvent the Ordinance throughout the application process, and increased noise and

parking issues. *See id.* at 96-99. Despite the Planning Commission's denial of site plan approval,

Plaintiffs converted the 31 Seminary Property into a two-unit dwelling with five bedrooms per

unit and have rented the units since 2011. *See* Dkt. No. 99-14 at ¶ 18; Dkt. No. 99-8 at 72-125;

Dkt. No. 99-9 at 1-164; Dkt. No. 118-3 at 6.

**B.     Procedural History**

Plaintiffs commenced the instant action on November 2, 2011 by filing a complaint

alleging that in relation to the denial of the permits and variances sought for the 26 Seminary and

31 Seminary Properties, Defendants (1) violated Plaintiffs' equal protection rights; (2) violated

Plaintiffs' due process rights by passing an unconstitutionally vague ordinance; (3) violated

Plaintiffs' substantive due process rights; and (4) violated Plaintiffs' procedural due process rights.

*See* Dkt. No. 1. Plaintiffs also sought a declaratory judgment from the Court that certain

provisions of the Ordinance are unconstitutionally vague. *Id.* at 49-50.

On April 18, 2012, the Court issued a Memorandum-Decision and Order that dismissed

with prejudice Plaintiffs' substantive and procedural due process claims related to the 31 Seminary

Property as collaterally estopped by an October 11, 2010 Decision, Order and Judgment of the

Supreme Court of the State of New York, Cortland County, and dismissed without prejudice

Plaintiffs' equal protection claim based upon a "selective enforcement theory." *See* Dkt. No. 38 at

40-41.  On May 1, 2012, Plaintiffs filed an amended complaint that asserted the same causes of action as the initial complaint and expanded on the factual allegations related to Plaintiffs' "selective enforcement" equal protection claim.  *See* Dkt. No. 40.  On June 5, 2013, the Court denied Plaintiffs' motion for partial summary judgment as to their claim that the Ordinance is unconstitutionally vague.  *See* Dkt. No. 60.

On December 1, 2014, Defendants moved for summary judgment on all of Plaintiffs' claims.  *See* Dkt. No. 99.  On February 26, 2015, Plaintiffs opposed Defendants' motion and cross-moved for summary judgment on all claims.  *See* Dkt. No. 118.  Defendants oppose Plaintiffs' cross-motion.  *See* Dkt. No. 120.

### III. DISCUSSION

**A.      Summary Judgment Standard**

A court may grant a motion for summary judgment only if it determines "that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law."  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried."  *Id.* at 36-37 (quotation and other citation omitted).  The movant has the burden of showing that no genuine factual dispute exists, and "where the movant 'fail[s] to fulfill its initial burden' of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, '"even if no opposing evidentiary matter is presented,"' for the non-movant is not required to rebut an insufficient showing."  *Giannullo v. City of New York*, 322 F.3d 139, 140-41 (2d Cir. 2003) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 160 (1970)).

In assessing the record to determine whether a genuine issue of material fact exists, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36. A party opposing a motion for summary judgment may not simply rely on the assertions in its pleading, but rather must "by [the party's] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

**B.     Vagueness Challenge**

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. Among the fundamental protections of due process under the Fourteenth Amendment "is the principle that [n]o one may be required at peril of life, liberty or property to speculate as to the meaning of . . . statutes. All are entitled to be informed as to what the State commands or forbids." *Cunney v. Bd. of Trs. of Vill. of Grand View*, 660 F.3d 612, 620 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 287 (1961)). A statute may be so vague as to deny due process on one of two independent grounds. *Id.* "First, a law violates due process 'if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.'" *Id.* at 620-21 (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). "Animating this first vagueness ground is the constitutional principle that individuals should receive fair notice or warning when the state has prohibited specific behavior or acts." *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007); *see also Smith v. Goguen*, 415 U.S. 566, 572 (1974) ("The doctrine incorporates notions of fair notice or warning."). "The relevant inquiry is 'whether the language

conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices.'" *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 187 (2d Cir. 2010) (quoting *Rubin v. Garvin*, 544 F.3d 461, 467 (2d Cir. 2008)).

"Second, a law is unconstitutionally vague 'if it authorizes or even encourages arbitrary and discriminatory enforcement.'" *Cunney*, 660 F.3d at 621 (quoting *Hill*, 530 U.S. at 732). A statute or regulation may be unconstitutionally vague under this second criterion "when it fails to provide sufficiently explicit standards for those who apply it [and] impermissibly delegates basic policy matters . . . for resolution on an ad hoc and subjective basis." *Farid v. Ellen*, 593 F.3d 233, 243 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Chatin v. Coombe*, 186 F.3d 82, 89 (2d Cir. 1999)). "In other words, in order to survive a vagueness challenge, a rule must both provide adequate notice to those who are governed by it *and* adequately cabin the discretion of those who apply it." *Id.*

"The Supreme Court has cautioned that this doctrine does not require 'meticulous specificity' from every statute." *Thibodeau*, 486 F.3d at 66 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)). "Instead, '[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment.'" *Id.* (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982)). Specifically, "[t]he degree of vagueness tolerated in a statute varies with its type: economic regulations are subject to a relaxed vagueness test, laws with criminal penalties to a stricter one, and laws that might infringe constitutional rights to the strictest of all." *VIP of Berlin*, 593 F.3d at 186 (quotation omitted).

In reviewing a statute's language for vagueness, the court is "relegated . . . to the words of the ordinance itself . . . and, perhaps to some degree, to the interpretation of the statute given by

those charged with enforcing it." *Cunney*, 660 F.3d at 621 (quoting *Grayned*, 408 U.S. at 110). "In addition to the plain meaning of the ordinance's wording . . . the ordinance's stated purpose . . . [can] provide[] additional clarity and guidance." *VIP of Berlin*, 593 F.3d at 188 (citing *Grayned*, 408 U.S. at 112). Thus, "regulations may embody 'flexibility and reasonable depth,' and 'satisfy due process as long as a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, has fair warning of what the regulations require.'" *Cunney*, 660 F.3d at 621 (quoting *Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 156 (2d Cir. 1999)).

Here, Plaintiffs argue that the Ordinance is unconstitutionally vague because it does not define the term "change of use," and therefore does not provide adequate notice as to which property conversions require Series A Site Plan approval under § 410-36(A). *See* Dkt. No. 118-1 at 31-32. Defendants argue that although the Ordinance does not define the phrase "change of use," § 410-27 lists single-unit residences and two-unit residences as two distinct property uses, thus providing property owners sufficient notice that conversion from a single-unit to two-unit residence is a change in use requiring Series A Site Plan approval. *See* Dkt. No. 99-15 at 29.

Defendants are correct that single-unit residences and two-unit residences are treated as distinct uses throughout the Ordinance. *See* Zoning Ordinance § 410-27(A)(1)(a) (identifying "single-unit residence" but not "two-unit residence" as a principal use permitted by right in an R-1 Residential Single-Unit Dwelling District); *id.* § 410-27(B)(1)(a) (listing "single-unit residence" and "two-unit residences" as two separate principal uses permitted by right in an R-2 Residential One- and Two-Unit Dwelling District); *id.* § 410-27(C)(1)(a) (listing "single-unit residence" and "two-unit residences" as two separate principal uses permitted by right in an R-3 Residential Multi-Unit Dwelling District); *see also id.* § 410-28 (establishing different bulk requirements for

single- and two-unit residences); *id.* § 410-53(G) (listing "single-unit dwelling" and "two-unit dwelling" as separate land uses for purposes of off-street parking requirements). As the Ordinance clearly and consistently treats single- and two-unit residences as distinct land uses, the Court cannot agree with Plaintiffs that a person of ordinary intelligence would not understand that converting a property from a single-unit residence to two-unit residence comprises a change in use under the plain text of the Ordinance. Similarly, the Ordinance's extensive list of separate property uses provides sufficiently specific standards to the city officials tasked with enforcing the Ordinance to adequately limit their enforcement discretion in determining what comprises a change in use. In addition, the stated purpose of the Ordinance—"to expand the types of projects which require Planning Commission review and approval"—provides additional guidance and supports Defendants' position that any change from one listed land use to another is a change in use requiring the more stringent Series A Site Plan approval. Dkt. No. 99-2 at 68; *see VIP of Berlin*, 593 F.3d at 188-89 (finding that the stated purpose of a zoning ordinance provided clarity as to the ordinance's meaning that helped render it sufficiently clear).

The Court also notes that the phrase "change of occupancy" does not appear in the Ordinance. *See* Dkt. No. 118-12. Thus, Plaintiffs' contention that the Ordinance creates uncertainty as to which conversions constitute changes of use as opposed to changes of occupancy is belied by the plain text of the Ordinance. Further, Plaintiffs' reliance on the interpretations of other municipalities of their own zoning codes, many of which expressly differentiate between change of use and change of occupancy, is inapposite.

Moreover, Plaintiffs' arguments concerning Defendants' purported confusion as to the meaning of "change of use"—which Plaintiffs contend evidences the vagueness of the Ordinance — are unavailing. First, Plaintiffs refer the Court to various permit applications which indicated

when prompted that Plaintiffs' proposed conversions of the 26 and 31 Seminary Properties were not changes of use. *See, e.g.*, Dkt. No. 118-5 at 91; Dkt. No. 118-6 at 52. However, the applications were completed by Plaintiffs or their agents, and Plaintiffs' own representations to Defendants concerning whether Plaintiffs' proposals constituted changes of use are not probative of Defendants' understanding of the term. Second, despite claiming that Defendants demonstrated the "inability to comprehend the meaning of 'change of use' as it applies to enforcing the Ordinance," Dkt. No. 118-1 at 31, Plaintiffs proffer no evidence of confusion on the part of Defendants regarding whether Plaintiffs' proposed conversions were changes of use. Defendants consistently represented to Plaintiffs that the conversion of a one-unit dwelling to a two-unit dwelling was a change of use as contemplated by the Ordinance. *See, e.g.*, Dkt. No. 118-6 at 67 (expressing this position by letter dated May 8, 2009); *id.* at 93 (stating the same in a letter dated July 10, 2009); *id.* at 97 (expressing the same position by letter dated June 29, 2009); *id.* at 129-32 (confirming the ZBA's agreement with this position by unanimous vote at a public hearing on December 1, 2009). Although Defendant Chadwick did state in deposition testimony on April 29, 2014 that conversion from a single-family to two-family residence with four bedrooms required Series A Site Plan approval because such approval was required for all new construction, he corrected this answer to reflect that Series A Site Plan approval was required for such a conversion because it was a change of use after refreshing his memory by reviewing the Ordinance. *See id.* at 129-30. Additionally, Defendant Young's deposition testimony that converting a single unit from a four-bedroom unit to a three-bedroom unit would not be a change in use does not contradict Defendants' consistent position that converting a single-unit home to a two-unit home is a change in use. *See* Dkt. No. 118-1 at 32. In short, Plaintiffs have identified no evidence that the meaning of the term "change of use" was unclear to Defendants. *Cf. Cunney*,

660 F.3d at 622 (basing determination that a section of a village zoning law was unconstitutionally vague in part on the village defendants' various conflicting interpretations of the section's measurement requirements).

In light of the foregoing, the Court concludes that the use of the term "change of use" in § 410-36 of the Ordinance is not unconstitutionally vague.

## C.    Substantive Due Process

The Due Process Clause contains both a procedural and substantive component. *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990). The substantive component "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Id.* (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

To state a substantive due process claim, a plaintiff must demonstrate that (1) he was deprived of "a valid 'property interest' in a benefit that was entitled to constitutional protection at the time [he] was deprived of that benefit," and (2) that the defendants' actions in depriving him of that interest were "'so outrageously arbitrary as to be a gross abuse of governmental authority.'" *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 17 (2d Cir. 1999) (quoting *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999)); *see also Ferran v. Town of Nassau*, 471 F.3d 363, 369-70 (2d Cir. 2006) (holding that the plaintiff must establish that the government misconduct was "arbitrary," "conscience-shocking," or "oppressive in the constitutional sense," and not merely "incorrect or ill-advised" (internal quotation marks and citation omitted)). In the context of substantive due process claims arising out of land use regulation, the Second Circuit has instructed courts to be "mindful of the general proscription that federal courts should not become zoning boards of appeal to review nonconstitutional land[-]use determinations by the [C]ircuit's many local legislative and administrative agencies." *Lisa's Party City*, 185 F.3d at 17

(internal quotation marks and citation omitted).

"In order for an interest in a particular land-use benefit to qualify as a property interest for purposes of the substantive due process clause[,] a landowner must show a 'clear entitlement' to that benefit." *O'Mara v. Town of Wappinger*, 485 F.3d 693, 700 (2d Cir. 2007) (quoting *Clubside, Inc v. Valentin*, 468 F.3d 144, 152 (2d Cir. 2006)). In other words,

> to establish a federally protectable property interest in a state or local permit for which a plaintiff has applied, the plaintiff must show that, at the time the permit was denied, there was no uncertainty regarding his entitlement to it under applicable state or local law, and the issuing authority had no discretion to withhold it in his particular case.

*Natale*, 170 F.3d at 263 n.1. The clear entitlement inquiry "'focuses on the extent to which the deciding authority may exercise discretion in arriving at a decision, rather than on an estimate of the probability that the authority will make a specific decision.'" *Clubside*, 468 F.3d at 153 (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 680 (2d Cir. 1995)) (emphasis omitted). "Usually, entitlement turns on whether the issuing authority lacks discretion to deny the permit, i.e., is required to issue it upon ascertainment that certain objectively ascertainable criteria have been met." *Natale*, 170 F.3d at 263. The court's analysis of the plaintiff's property interest "therefore turns on the degree to which state and local law unambiguously limits the [defendants'] discretion to deny [the plaintiff's] petition." *Clubside*, 468 F.3d at 154. "Even if in a particular case, objective observers would estimate that the probability of issuance was extremely high, the opportunity of the local agency to deny issuance suffices to defeat the existence of a federally protected property interest." *RRI Realty Corp. v. Incorporated Village of Southampton*, 870 F.2d 911, 918 (2d Cir. 1989). "Since the entitlement analysis focuses on the degree of official discretion and not on the probability of its favorable exercise, the question of whether an applicant has a property interest will normally be a matter of law for the court." *Id.*

26

To meet the second prong of the substantive due process analysis, a plaintiff must establish "that the conduct of the defendants in denying the permits was so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale*, 170 F.3d at 263. "Government regulation of a landowner's use of his property is deemed arbitrary or irrational, and thus violates his right to substantive due process, only when government acts with no legitimate reason for its decision." *Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 102 (2d Cir. 1992) (internal quotation marks and citation omitted). Therefore, "where the governmental entity has legitimate interests which could rationally be furthered through the complained-of action, a substantive due process claim must fail." *Lexjac, LLC v. Incorporated Village of Muttontown*, No. 07-CV-4614, 2011 WL 1059122, *7 (E.D.N.Y. Mar. 18, 2011) (citing *Harlen Assocs. v. Incorporated Village of Mienola*, 273 F.3d 494, 505 (2d Cir. 2001)).

In the instant matter, Defendants argue that 26 Seminary cannot establish that it had a federally protected property interest in the area variance it sought because the ZBA had significant discretion over whether to grant the variance. *See* Dkt. No. 99-15 at 10-12. Defendants further argue that even if 26 Seminary could establish a protected property interest, Plaintiffs cannot prove that Defendants acted in an outrageously arbitrary or irrational manner in denying 26 Seminary's variance application. *See id.* at 14-15. Plaintiffs contend that 26 Seminary had a clear entitlement to the permits it sought because the property was "grandfathered" as a three-family home prior to the enactment of the Ordinance. *See* Dkt. No. 118-1 at 7-11. Alternatively, Plaintiffs contend that 26 Seminary established a vested right in the permits sought by "expend[ing] significant sums of money renovating and converting the property in accordance with [Defendant Chadwick's letter dated July 3, 2007]." *Id.* at 13. Plaintiffs further contend that Defendants' cancellation of 26 Seminary's permits was arbitrary and outrageous. *Id.* at 13-14.

Plaintiffs' argument that the 26 Seminary Property was "grandfathered" as a three-family home and therefore not subject to the requirements of the Ordinance relies upon a July 3, 2007 letter from Defendant Chadwick to William M. Thomas which stated "[t]he property located at [26 Seminary Avenue] is in a R-3 Zoning District and the use as a three family is a legal non-conforming use according to the Zoning Ordinance of the City of Binghamton." Dkt. No. 118-5 at 28. Defendant Chadwick explained in his deposition testimony that the letter was a zoning compliance letter, which indicated that the use of the 26 Seminary Property on the date of the letter was legally approved as a nonconforming use. *See* Dkt. No. 118-16 at 153-54. It is undisputed that at the time the letter was issued — and at the time that 26 Seminary purchased the property — the 26 Seminary Property contained a commercial space on the first floor, two residential units on the second floor, and one residential unit on the third floor. *See id.* at 156-85; Dkt. No. 99-2 at 47. Thus, Defendant Chadwick's letter does not establish that 26 Seminary was clearly entitled to convert the 26 Seminary Property from its prior legal non-conforming use to a different non-conforming use without seeking the requisite approval. Accordingly, Plaintiffs' contention that 26 Seminary was not required to comply with the parking requirements of the Ordinance because the property's "legal non-conforming status allowed the parking of the building to continue as it was pre-Ordinance" is unavailing, as 26 Seminary did not seek to continue the legal non-conforming use of the property. Dkt. No. 118-1 at 8.[5]

Plaintiffs' alternative argument that 26 Seminary acquired a vested right to permits

---

[5] As Plaintiffs did not seek to continue the legal non-conforming use of the property, Plaintiffs' argument that they acquired a vested right in a *different* non-conforming use of the property is contrary to New York law, which recognizes that "a [legal] nonconforming use that predates the enactment of a restrictive zoning ordinance is a vested right entitled to constitutional protection." *Norton v. Town of Islip*, 239 F. Supp. 2d 264, 270 (E.D.N.Y.) (citing *Town of Somers v. Camarco*, 380 N.Y. 537 (1955) (other citation omitted)).

authorizing the conversion of the 26 Seminary Property into a three-unit dwelling by performing significant work in reliance on the valid permits previously issued by Defendants is also without merit. Under New York law, "a vested right can be acquired when, pursuant to a legally issued permit, the landowner demonstrates a commitment to the purpose for which the permit was granted by effecting substantial changes and incurring substantial expenses to further the development." *Town of Orangetown v. Magee*, 88 N.Y.2d 41, 47 (1996) (citations omitted). "However, neither the issuance of the [permit], nor the landowner's substantial changes and expenditures, standing alone, will establish a vested right." *Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 450-51 (S.D.N.Y. 1998) (citing *Magee*, 88 N.Y.2d at 47). Rather, "the landowner's reliance on the [permit] must have been so substantial that the municipal action 'results in serious loss rendering the improvements essentially valueless.'" *Id.* at 451 (quoting *Magee*, 88 N.Y.2d at 48).

Plaintiffs argue that 26 Seminary performed substantial modifications on the 26 Seminary Property in reliance on the building permits issued to it on January 4, 2008, May 2, 2008, and July 3, 2008. However, each of the issued building permits was limited in scope. The January 4, 2008 building permit authorized the installation of sub-flooring for radiant heating. *See* Dkt. No. 118-5 at 79-83. The May 2, 2008 building permit authorized interior renovations including framing walls and installing partial sheet rock. *Id.* at 87-89. The July 3, 2008 building permit authorized a roof replacement. *Id.* at 93. None of the permits issued authorized 26 Seminary to convert the commercial space on the first floor to an apartment, nor to increase the number of bedrooms in the existing second- and third-floor residential spaces to five. Thus, any work performed by 26 Seminary specific to converting the property to a three-unit dwelling was not performed in reliance on a valid permit issued for that purpose. *See In re Exeter Bldg. Corp. v. Town of*

*Newburgh*, 114 A.D.3d 774, 780 (2d Dept. 2014) ("[T]he plaintiffs may not ground a claim of common-law vesting upon reliance on the limited permits that were issued to them. None of those permits—which authorized demolition of the single-family house and the water tanks, erection of a sign, and regrading and clearing—either singly or together amounted to the Town's approval of [the plaintiffs' proposed subdivision]. Thus, the plaintiffs' expenditures and construction in reliance on those limited permits could not satisfy the prerequisite for common-law vesting of the right to construct the entire project."); *cf. Magee*, 88 N.Y.2d at 46-48 (concluding that defendants had a vested right in the construction of a large industrial building based on the issuance of a building permit authorizing the construction of the entire building that was later wrongfully revoked).[6]

Plaintiffs also argue that 26 Seminary was not required to obtain Series A Site Plan approval under Ordinance § 410-36(B), which excepts from Series A Site Plan review, *inter alia*, "any change of use from one principal permitted or accessory use to another principal permitted or accessory use," where the Planning Department and Building Inspector make certain determinations regarding the impact of the proposed change of use. Zoning Ordinance § 410-36(B)(ii). However, pursuant to Ordinance § 410-27(C), commercial use is not a principal permitted or accessory use in an R-3 Residential Multi-Unit Dwelling District. *Id.* § 410-36(C). Accordingly, the § 410-36(B)(ii) exception was not applicable to 26 Seminary's proposed

---

[6] The Court also notes that the only work 26 Seminary has identified that it performed in reliance on the permits is the installation of sub-flooring radiant heating. *See* Dkt. No. 118-1 at 13; Dkt. No. 99-10 at 11-12 (describing work completed on the 26 Seminary Property as including cleaning out the premises, studding the first floor, and starting to set up for radiant heat). This limited work, which is not specific to 26 Seminary's desired conversion to a three-unit residence, is plainly not "so substantial that the municipal action [of denying the area variance application] results in serious loss rendering the improvements essentially valueless." *Magee*, 88 N.Y.2d at 47-48.

conversion, and 26 Seminary was required to obtain Series A Site Plan approval for its proposed change of use from a mixed commercial and residential property to a three-unit dwelling. Plaintiffs have therefore failed to establish 26 Seminary's clear entitlement to convert the 26 Seminary Property to a three-dwelling home with one residential unit per floor in the absence of Series A Site Plan approval and a special use permit.

Finally, Plaintiffs cannot establish that 26 Seminary had a clear entitlement to an area variance for parking. Plaintiffs appear to concede this point, as they make no argument that 26 Seminary had a federally protected property interest in the requested variance. In deciding whether to grant 26 Seminary the variance, the ZBA was to "weigh the benefit to the applicant if the variance is granted against the detriment to the health, safety, and welfare of the neighborhood or community by such a grant," and consider factors including the potential for an undesirable change to the neighborhood or an adverse impact on the physical and environmental conditions of the neighborhood, the existence of reasonable alternatives, the substantiality of the requested variance, and whether the alleged hardship was self-created. Dkt. No. 99-2 at 28. The ZBA therefore enjoyed considerable discretion to deny 26 Seminary's application on a number of grounds. Accordingly, "the opportunity of the local agency to deny issuance suffices to defeat the existence of a federally protected property interest." *RRI Realty Corp.*, 870 F.2d at 918; *see also Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 59 (2d Cir. 1985) (concluding that the plaintiffs had not established clear entitlement to a certificate where the zoning board of appeals had wide discretion to consider a number of factors in issuing the certificate).

As 26 Seminary lacks any property interest protected under the Due Process Clause, the Court grants Defendants' motion for summary judgment on 26 Seminary's substantive due process

claim.[7]

**D.     Procedural Due Process**

In order to establish a violation of procedural due process, "a plaintiff must 'first identify a property right, second show that the state has deprived him of *that* right, and third show that the deprivation was effected without due process.'" *Local 342, Long Island Pub. Serv. Emps. v. Town Bd. of Town of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994) (quoting *Mehta v. Surles*, 905 F.2d 595, 598 (2d Cir. 1990) (per curiam)).   A deprivation is effected without due process if the plaintiff is "deprived of an *opportunity* . . . granted at a meaningful time and in a meaningful manner for [a] hearing appropriate to the nature of the case." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988) (internal quotation marks omitted) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971)).

If the alleged deprivation of property is attributable to "random, unauthorized acts by state employees," the due process clause is not violated "so long as the State provides a meaningful postdeprivation remedy." *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996) (citing *Hudson v. Palmer*, 468 U.S. 517, 531, 533 (1984)).   "When the deprivation occurs in the more structured environment of established state procedures, rather than random acts, the availability of postdeprivation procedures will not, ipso facto, satisfy due

---

[7]   Even if 26 Seminary could establish a federally protected property interest in the area variance, Plaintiffs cannot demonstrate that Defendants' denial of the variance was "so outrageously arbitrary as to constitute a gross abuse of governmental authority," *Natale*, 170 F.3d at 263, as Defendants based their denial on the potential exacerbation of an existing scarcity of on-street parking and potential undesirable changes in the character of the neighborhood, *see* Dkt. No. 99-2 at 35-37.   Plaintiffs do not argue this point, arguing instead that Defendants' "wrongful cancellation" of 26 Seminary's permits was outrageously arbitrary. *See* Dkt. No. 118-1 at 13-14. However, it is undisputed that Defendants cancelled 26 Seminary's building permits because 26 Seminary installed flooring without the required inspection and failed to perform work on the permits within the permits' allotted time frame. *See* Dkt. No. 118-5 at 83; Dkt. No. 118-20 at 29-30.   The cancellation of permits was thus clearly not constitutionally arbitrary.

process." *Id.* (citing *Hudson*, 468 U.S. at 532). Rather, the court must

> determine what process was due . . . by balancing the following
> three factors: "First, the private interest that will be affected by the
> official action; second, the risk of an erroneous deprivation of such
> interest through the procedures used, and the probable value, if any,
> of additional or substitute procedural safeguards; and finally, the
> Government's interest, including the function involved and the
> fiscal and administrative burdens that the additional or substitute
> procedural requirement would entail."

*Rivera-Powell v. N.Y. City Bd. of Elections*, 470 F.3d 458, 466 (2d Cir. 2006) (internal citation

omitted) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

The basis for Plaintiffs' procedural due process claim is less than clear. Plaintiffs state that

"[D]efendants' wrongful enforcement of the Ordinance against 26 Seminary, when the Ordinance

was in fact not applicable, or, at a minimum, applicable, but erroneously imposed, deprived

plaintiffs of their federally protected rights." Dkt. No. 118-1 at 14. To the extent that Plaintiffs

are arguing that 26 Seminary had a federally protected property interest in converting the 26

Seminary Property to a three-unit dwelling without obtaining Series A Site Plan approval, the

Court rejected this argument above. The Court also already determined that 26 Seminary cannot

establish clear entitlement to the area variance it sought from the ZBA.

To the extent that Plaintiffs argue that Defendants revoked 26 Seminary's building permits

without due process, Plaintiffs cannot dispute that the permits either expired or were cancelled

because Plaintiffs failed to perform the authorized work within the time allotted. *See* Dkt. No.

118-5 at 83; Dkt. No. 118-20 at 29-30. Any constitutionally protected property interest 26

Seminary may have had in the building permits expired when the term of the permit expired or

when 26 Seminary failed to commence the authorized work within six months of the issuance of

the permit. *See* Dkt. No. 118-6 at 2 (noting that the issued building permit would expire within

twelve months and become invalid if no work was performed within six months of issuance).

33

Consequently, Defendants did not deprive 26 Seminary of a federally protected property interest by recognizing that its building permits had expired or become invalid due to 26 Seminary's failure to commence work.

As Plaintiffs cannot establish the deprivation of a constitutionally protected property interest, the Court grants Defendants' motion for summary judgment on 26 Seminary's procedural due process claim. *See Gagliardi v. Village of Pawling*, 18 F.3d 188, 193 (2d Cir. 1994) ("The deprivation of a procedural right to be heard, however, is not actionable when there is no protected right at stake.").

## E. Equal Protection

"The Equal Protection Clause requires that the government treat all similarly situated people alike." *Harlen Assocs*, 273 F.3d at 499 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). "Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, [the Second Circuit has] long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Id.* (citation omitted). "To state an equal protection claim, a plaintiff must charge a governmental officer 'not only with deliberately interpreting a statute against the plaintiff, but also with singling him out alone for that misinterpretation.'" *Gagliardi*, 18 F.3d at 193 (quoting *Brady v. Colchester*, 863 F.2d 205, 216 (2d Cir. 1988)). "Where, as here, a plaintiff does not claim to be a member of a constitutionally protected class, he may bring an Equal Protection claim pursuant to one of two theories: (1) selective enforcement, or (2) 'class of one.'" *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 433 (S.D.N.Y. 2013).

In order to make out an equal protection claim based upon selective enforcement, a

plaintiff must establish that:

> (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.

*Zahra*, 48 F.3d at 683 (quoting *FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 (2d Cir. 1992)). The Second Circuit has recognized that "cases predicating constitutional violations on selective treatment motivated by ill-will, rather than by protected-class status or an intent to inhibit the exercise of constitutional rights, are 'lodged in a murky corner of equal protection law in which there are surprisingly few cases and no clearly delineated rules to apply.'" *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980)). It is clear, however, that a plaintiff must allege more than mere conclusory allegations or speculation to establish malicious or bad faith intent on behalf of a defendant to harm the plaintiff. *See Harlen Assocs.*, 273 F.3d at 502 ("Although the issue of whether an action was motivated by malice generally is a question of fact properly left to the jury, we will uphold a grant of summary judgment where the nonmoving party adduces nothing more than speculation to support its claims."); *Lisa's Party City*, 185 F.3d at 17 (granting defendants summary judgment on the plaintiff's selective enforcement claim where the plaintiff's assertion of impermissible motive was "sheer 'conjecture and speculation'" (quoting *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998)).

A plaintiff states a valid "class of one" equal protection claim "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (citations omitted).

35

> The pertinent question in a ["class of one"] claim is not whether the defendants correctly understood the rules they were enforcing. *Olech* does not empower federal courts to review government actions for correctness. Rather, an *Olech*-type equal protection claim focuses on whether the official's conduct was rationally related to the accomplishment of the work of their agency.

*Bizarro*, 394 F.3d at 88-89. "Stated differently, a plaintiff asserting a 'class of one' equal protection claim must allege that the intentional disparate treatment alleged . . . was 'wholly arbitrary' or 'irrational.'" *Vaher*, 916 F. Supp. 2d at 433 (quoting *Aliberti v. Town of Brookhaven*, 876 F. Supp. 2d 153, 163 (E.D.N.Y. 2012)).

Although "there is disagreement within the Second Circuit regarding the precise standard for determining whether comparators are similarly situated for [selective enforcement and 'class of one'] claims," *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011), this Court has previously expressed its agreement with those courts that have employed a more demanding standard of similarity for "class of one" claims than for selective enforcement claims, *see Norwood v. Salvatore*, No. 3:12-CV-1025, 2014 WL 203306, *6-7 (N.D.N.Y. Jan. 17, 2014). Specifically, in a "class of one" claim, "the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008) (per curiam). Thus, the plaintiffs and comparators must be "*prima facie* identical." *Id.* at 105. The Second Circuit has "deem[ed] that test to require a plaintiff in . . . a 'class of one' case to show that: (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Id.* (citing *Olech*, 528 U.S. at 565). In a selective enforcement claim,

"plaintiffs 'must identify comparators whom a prudent person would think were roughly equivalent[, but] [p]laintiff[s] need not show an exact correlation between [themselves] and the comparators.'" *Mosdos Chofetz*, 815 F. Supp. 2d at 696 (quoting *Abel v. Morabito*, No. 04-CV-07284, 2009 WL 321007, at *5 (S.D.N.Y. Feb. 10, 2009)).  "Put another way: 'The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. . . .  Exact correlation is neither likely or necessary, but the cases must be fair congeners.'"  *Id.* (quoting *T.S. Haulers, Inc. v. Town of Riverhead*, 190 F. Supp. 2d 455, 463 (E.D.N.Y. 2002)).

Plaintiffs allege that they are similarly situated to two comparators: 63 Front Street and 46 Seminary Avenue.  63 Front Street is located in a C-5 Neighborhood Office District.  *See* Dkt. No. 99-5 at 2.  Karen and Anthony Gallinari applied to the Planning Commission for Series A Site Plan approval and a special use permit and to the ZBA for a use variance to convert a large single-family residence that had been converted to mixed office and apartment use at 63 Front Street to a fraternity house.  *See id.*; *id.* at 10-11.  With their application, the Gallinaris initially submitted a plan for five parking spaces that did not comply with the Ordinance's nine-foot width requirement. *See id.* at 32.  The Gallinaris then submitted a revised plan demonstrating four parking spaces that did comply with the Ordinance's width requirement.  *See id.* at 33.  The ZBA granted the Gallinaris a use variance, noting that the property had been on the market for two years and that its residential units had been vacant for ten years, as well as the property's unique large front setback and the change in elevation from the sidewalk to the property's front door that limited its potential commercial uses.  *See id.* at 36.  The Planning Commission approved the Gallinaris' Series A Site Plan and granted a special use permit on the condition, *inter alia*, that the petitioners obtain a formal lease agreement recorded with Broome County for one off-street parking space

located within 500 feet of the property to continue in perpetuity with the use of the fraternity house. *See* Dkt. No. 99-4 at 92.[8]

46 Seminary Avenue is located in an R-3 Residential Multi-Unit Dwelling District. *See id.* at 57. In 2010, Brian Kasmarcik applied to the Planning Commission for Series A Site Plan approval and a special use permit to convert the property, which had previously been used as a commercial bakery, into a take-out/carry-out restaurant. *See id.* at 61. The Planning Commission granted Mr. Kasmarcik approval and a special use permit on the condition, *inter alia*, that he obtain use and area variances from the ZBA. *See id.* at 62. Accordingly, Mr. Kasmarcik applied to the ZBA for a use variance and area variances for minimum driveway width and minimum off-street parking. *See id.* at 57. The ZBA granted Mr. Kasmarcik both variances after finding that not allowing the property to continue as a commercial space would constitute economic deprivation and that the project would reduce the non-conforming nature of the property by removing several additions to the building and increasing the number of off-street parking spaces available. *See id.* at 58-59.

Plaintiffs first contend that the issue of whether they are similarly situated to 63 Front Street and 46 Seminary Avenue was already decided in an October 5, 2011 Decision, Order and Judgment of the New York State Supreme Court, Cortland County, and this Court's Memorandum-Decision and Order dated April 19, 2012. *See* Dkt. No. 118-1 at 15-16. This argument is without merit, as both decisions involved a review of the legal sufficiency of the allegations in Plaintiffs' complaint/petition, not a review of the evidence on a motion for summary

---

[8] The Planning Commission also instructed that should the Gallinaris' final floor plan submitted to the Building Department require more than a minimum of five off-street parking spaces, the Gallinaris were further required to obtain lease agreements for any additional required off-street parking spaces. Dkt. No. 99-4 at 92.

judgment. *See* Dkt. No. 118-14 at 84-85; Dkt. No. 118-15 at 36-40; *see also Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir. 2013) ("[T]he [law of the case] doctrine would not preclude a district court from granting summary judgment based on evidence after denying a motion to dismiss based only on the plaintiff's allegations. . . . It was not error for the court to revisit a conclusion based on factual allegations taken as true at the motion to dismiss stage, and determine, based on undisputed evidence at the summary judgment stage, that no reasonable jury could find that the type of action [alleged] occurred.").[9]

Plaintiffs next argue that the 26 and 31 Seminary Properties are similarly situated to 63 Front Street and 46 Seminary because they involve similar types of land use and similar requests to provide less than the minimum required number of off-street parking spaces. *See* Dkt. No. 118-1 at 17-18. Plaintiffs appear to argue that because 63 Front Street was a commercial space with two residential apartments, it was similarly situated as a matter of law to the 31 Seminary Property, which contained a commercial space and two residential apartments. *See id.* at 17. First, the Court does not agree that the required showing in a land use case is "simply that the comparative parties are engaged in the same type of land use." *Id.* The Second Circuit has stated

---

[9] Plaintiffs quote Judge Rumsey's decision as stating that "'*[h]ere the evidence demonstrates* that the properties listed by plaintiffs were "roughly equivalent" to petitioners' properties at 26 Seminary Avenue and 31 Seminary Avenue and that their owners received permits or variances denied to petitioners.'" Dkt. No. 118-1 at 16 (emphasis added). Judge Rumsey's decision in fact states:

> *[h]ere the proposed second amended petition contains sufficient allegations to plead a prima facie claim of selective enforcement. It contains facts which, if proven, would allow a conclusion* that the properties located at 46 Seminary Avenue and 63 Front Street are, at least, "roughly equivalent" to petitioners' properties at 26 Seminary Avenue and 31 Seminary Avenue and that their owners received permits or variances denied to petitioners.

Dkt. No. 118-14 at 84-85 (internal citation omitted) (emphasis added). Thus, the actual text of the decision makes clear that Judge Rumsey was analyzing the legal merit of Plaintiffs' allegations, not reviewing evidence as suggested by Plaintiffs.

that "in the land-use context, to be prima facie similar, the comparators must be engaged in the same type of land use." *Clubside*, 468 F.3d at 160. However, the court then proceeded to discuss other factors affecting the similarly-situated analysis, including type of housing, density levels, layouts, and variances sought. *See id.*; *see also Ruston Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59-60 (2d Cir. 2010) (finding the plaintiffs' allegations of similarly situated comparators deficient where the alleged comparators involved different types of land uses and density levels from the plaintiffs' proposed development). Second, the relevant inquiry is whether the development approved by Defendants for the alleged comparators and Plaintiffs' proposed development were similarly situated. Accordingly, the fact that 63 Front Street and the 31 Seminary Property were both mixed-use properties containing commercial and residential spaces prior to the proposed development is irrelevant.

Upon consideration of the relevant factors including land use, density level, and variances sought for each of the proposed projects, no reasonable juror could conclude that either of Plaintiffs' proposed developments were similarly situated to 63 Front Street or 43 Seminary Avenue under the stringent "class of one" standard. The 43 Seminary Avenue development involved converting an approved non-conforming commercial use of a property within a residential multi-dwelling district to a different but similar commercial use. Plainly, no reasonable juror could conclude that Plaintiffs' proposed multi-unit dwellings were so similar to a proposed takeout restaurant as "to exclude the possibility that the defendants acted on the basis of a mistake." *Clubside*, 468 F.3d at 159 (quoting *Neilson*, 409 F.3d at 105). In addition, the applicant's proposed development for 43 Seminary Avenue increased the number of off-street parking spots available from its prior use and was granted a parking variance in recognition of this fact.

The proposed development at 63 Front Street was more similar to Plaintiffs' proposals, as it involved converting a mixed-use property to an eight-bedroom fraternity home. Nonetheless, significant differences would prohibit a reasonable juror from finding 63 Front Street similarly situated to Plaintiffs' proposed developments, including (1) 63 Front Street's location within a neighborhood office district rather than a residential district like the 26 and 31 Seminary Properties; (2) the unique nature of the 63 Front Street property as cited in the ZBA's grant of a use variance; (3) the proposed number of residents; and (3) the applicant's ability to provide the required number of off-street parking spaces between the property itself and a lease of an off-street parking space within 500 feet of the residence. Notably, 26 Seminary was unable to provide a single off-street parking space for its residents and therefore requested a variance allowing it relief from the minimum five off-street spaces it was required to provide.

In view of the differences between the alleged comparators and Plaintiffs' properties in terms of proposed land uses, zoning districts, property characteristics, density level, and ability to provide required parking, the Court also finds that no reasonable juror could conclude on this record that the alleged comparators and Plaintiffs' properties were similarly situated even under the less stringent selective enforcement standard. The differences between the properties are so numerous and substantial that Plaintiffs cannot establish that an objective, prudent person would consider them roughly equivalent or to be fair congeners. *See Mosdos Chofetz*, 815 F. Supp. 2d at 696; *see also Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790-91 (2d Cir. 2007) (affirming district court's grant of summary judgment on plaintiffs' selective enforcement claim where the plaintiffs produced no evidence that its alleged comparators were similarly situated to the plaintiffs in any material way). Consequently, Plaintiffs have failed to establish a genuine issue of material fact as to whether their properties were similarly situated to the approved developments

at 63 Front Street and 43 Seminary Avenue.[10]

The Court also finds that Plaintiffs have failed to establish a material issue of fact as to whether Defendants' differential treatment of Plaintiffs was without a rational basis such that Plaintiffs' "class of one" claims also fail on this ground. Defendants provided ample rational explanations for their denial of both 26 Seminary's area variance application and 31 Seminary's Series A Site Plan and special use permit application that were based on the discretionary factors Defendants were required to consider by the Ordinance. *See supra* Part II(A)(2)-(3) (summarizing Defendants' reasons for denying Plaintiffs' permit applications). Plaintiffs' argument that these reasons were pretextual is devoid of support in the record and contradicted by the lengthy discussions of the cited factors at each public hearing on Plaintiffs' applications.

Plaintiffs have also failed to produce evidence of malice or bad faith intent to injure Plaintiffs sufficient to withstand Defendants' motion for summary judgment on their selective enforcement claims. Plaintiffs' allegations that Defendant Young was biased against them based on his previous legal representation of Plaintiffs' principals is purely speculative. Defendant Young disclosed his prior representation of Mr. Levin at the first Planning Commission hearing on 33 Seminary's application and indicated that he perceived no conflict in hearing the application. *See* Dkt. No. 118-7 at 12-13; *see also* Dkt. No. 118-8 at 8 (affirming during June 7, 2010 hearing that Defendant Young could act impartially in hearing Plaintiffs' applications). Mr. Levin did not oppose this statement, and Plaintiffs have produced no evidence in support of their

---

[10] Plaintiffs' argument that they were similarly situated to all other applicants for Series A Site Plan approval, special use permits, and area variances for parking requirements is also without merit. *See* Dkt. No. 118-1 at 15-16. The record is so devoid of any information about the granted applications outside of those of 63 Front Street and 46 Seminary Avenue that Plaintiffs rely solely on "sheer 'conjecture and speculation' that is insufficient to withstand [Defendants'] motion for summary judgment" to establish similarity between the other applicants and their properties. *Lisa's Party City*, 185 F.3d at 17 (quoting *Kerzer*, 156 F.3d at 400).

claim that they requested that Defendant Young recuse himself. The statements of Defendant Pollak cited by Plaintiffs do not exhibit any personal animus toward Plaintiffs. *See Harlen Assocs.*, 273 F.3d at 503 ("Enmity directed toward a business property use may not form the basis for a constitutional claim because equal protection rights vest in individuals rather than business activities. To the extent that the record reveals any hostility, it was directed at the proposed use of the property, not the owner, and therefore does not implicate the Equal Protection Clause." (citation omitted)). Nor do the statements of Councilwoman Rennia, which are also irrelevant as Plaintiffs have proffered no basis for imputing Ms. Rennia's statements to Defendants. Although Defendant Pompi did apologize to Mr. Levin at the June 7, 2010 Planning Commission hearing for exhibiting hostility towards Mr. Levin at the prior hearing, he explained that his hostility stemmed from Plaintiffs' attempts to evade the process for obtaining proper approvals of their proposed development. *See* Dkt. No. 118-8 at 8. The Second Circuit has explained that "[i]f the [defendants'] motivation . . . is to secure compliance with agency objectives, then by definition the motivation is not spite, or malice, or a desire to '"get" [someone] for reasons wholly unrelated to any legitimate state objective.'" *Bizzarro*, 394 F.3d at 87 (quoting *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995)).

The Court therefore grants Defendants' motion for summary judgment as to Plaintiffs' "class of one" and selective enforcement equal protection claims.

## F.     Absolute and Qualified Immunity

Defendants also argue that even if they violated Plaintiffs' constitutional rights, they are entitled to qualified immunity in their individual capacities because they did not violate a clearly established constitutional right. *See* Dkt. No. 99-15 at 33-35. "When a defendant invokes qualified immunity to support a motion for summary judgment, courts engage in a two-part

inquiry: whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "To be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The Second Circuit has held that "[a] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'" *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (quoting *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003)).

Here, the Court has determined that Defendants did not violate Plaintiffs' constitutional rights. However, even assuming *arguendo* that Plaintiffs had established that Defendants violated their constitutional rights, Plaintiffs have not identified a clearly established right that Defendants are alleged to have violated. Their sole conclusory statement that "the individual defendants' actions were arbitrary and capricious . . . and therefore violated plaintiffs' rights to substantive and procedural process" is insufficient to establish that Defendants unreasonably violated a clearly established right of Plaintiffs. Dkt. No. 118-1 at 33. Defendants denied Plaintiffs' permit and variance applications after multiple public hearings, substantial correspondence with Plaintiffs, consideration of the relevant factors set forth in the Ordinance, and offers to Plaintiffs for alternative solutions, such as converting the 31 Seminary Property to a two-unit dwelling with three bedrooms per unit. As Plaintiffs have not shown that a reasonable defendant would have understood from existing law that his or her conduct was unlawful, the Court grants Defendants' motion for summary judgment in their individual capacities on this alternative ground.

Defendants further argue that the members of the ZBA and Planning Commission are also entitled to absolute legislative immunity from suit in their individual capacities. Although the Second Circuit has recognized that members of a town board may be entitled to legislative immunity, such immunity extends only to legislative activity, such as the adoption of zoning law amendments. *See Orange Lake Assocs., Inc. v. Kirkpatrick*, 21 F.3d 1214, 1221-24 (2d Cir. 1994). The Court therefore agrees with the District of Connecticut's analysis in *South Lyme Property Owners Association v. Town of Old Lyme*, 539 F. Supp. 2d 547, 558 (D. Conn. 2008):

> The availability of legislative immunity depends on the form of the act, not on the office of the actor, and legislative officials may therefore be liable for their enforcement and administrative actions. *Supreme Court of Virginia*, 446 U.S. at 736, 100 S.Ct. 1967 (holding that the doctrine of legislative immunity did not bar prospective injunctive relief against the chief justice of the Virginia Supreme Court insofar as he was acting to enforce, rather than legislate, disciplinary rules); *see also Bogan*, 523 U.S. at 55, 118 S.Ct. 966 ("Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it."); *Scott v. Greenville County*, 716 F.2d 1409, 1423 (4th Cir.1983) ("When local zoning officials do more than adopt prospective, legislative-type rules and take the next step into the area of enforcement, they can claim only the executive qualified immunity appropriate to that activity.")[.]

Thus, Defendants are entitled only to qualified immunity for their enforcement actions such as issuing stop work permits or denying permits applications. The Court acknowledges but disagrees with the persuasive authority cited by Defendants stating that zoning and planning board members are absolutely immune for all actions taken in their official capacities in light of binding authority that legislative immunity is limited to legislative activity. *See Kirkpatrick*, 21 F.3d at 1221-24; *State Emps. Bargaining Agent Coalition v. Rowland*, 494 F.3d 71, 82, 89-93 (2d Cir. 2007).

## G. Personal Involvement

Finally, Defendants argue that Plaintiffs' claims against Defendant Ryan and Defendant

Frank must be dismissed because Plaintiffs have produced no evidence of their personal involvement in the alleged constitutional violations. *See* Dkt. No. 99-15 at 37-38. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Moffitt v. Town of Brookfield*, 950 F.2d 880, 886 (2d Cir. 1991) (quotation and other citations omitted).

> A defendant may be personally involved in a constitutional deprivation within the meaning of 42 U.S.C. § 1983 in several ways. The defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

*Id.* (quoting *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).

Defendants are correct that the record establishes no action taken on behalf of Defendant Ryan relative to Plaintiffs' permit and variance applications and no facts establishing a supervisory theory of liability for Defendant Ryan. The record is simply devoid of any evidence that Defendant Ryan, as Mayor, participated in the denials of Plaintiffs' proposals. Similarly, Defendant Frank, as Corporation Counsel for the City of Binghamton, was not a voting member of either the ZBA or Planning Commission, and did not otherwise participate in the ZBA and Planning Commission's activity other than providing legal advice. *See Zdziebloski v. Town of East Greenbush*, 336 F. Supp. 2d 194, 202 (N.D.N.Y. 2004) ("[The town attorney's] position as a legal advisor to the Board is insufficient. Involvement in discussions that lead to a decision is not personal involvement under § 1983." (citation omitted)). Thus, Defendants Ryan and Frank are also entitled to summary judgment on the claims against them in their individual capacities based

on lack of personal involvement in the alleged constitutional violations.[11]

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 99) is **GRANTED**; and the Court further

**ORDERS** that Plaintiffs' cross motion for summary judgment (Dkt. No. 118) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: July 28, 2015
      Albany, New York

_____
Mae A. D'Agostino
U.S. District Judge

---

[11] Dismissal of Plaintiffs' claims against the individual Defendants in their official capacities as redundant to Plaintiffs' claims against the City of Binghamton is unnecessary as the Court has granted summary judgment to all Defendants on each of Plaintiffs' claims. Were any of Plaintiffs' claims to proceed, Defendants are correct that "[w]ithin the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant." *Phillips v. County of Orange*, 894 F. Supp. 2d 345, 384 n.35 (S.D.N.Y. 2012) (citations omitted) (collecting cases); *see also Santana v. City of Ithaca*, No. 5:12-cv-625, 2013 WL 1855829, *5 (N.D.N.Y. May 1, 2013) (quoting the same).